IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CASEY KITAGAWA and BRANDON SHELDON, *individually and on behalf of all others similarly situated*, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § § | CIVIL ACTION NO. H-17-726 |
| DRILFORMANCE, LLC, | § § § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

### I.  Background

Casey Kitagawa and Brandon Sheldon, the named plaintiffs in this putative class action, work for Drilformance, LLC as applications engineers. Drilformance designs, manufactures, and rents drill bits to companies in the oil and gas industry. The plaintiffs, salaried employees, allege violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, based on a 10 percent across-the-board salary reduction.

Oil prices dropped in 2015, and so did drilling operations throughout the industry. The demand for drill bits also dropped. Drilformance's revenue followed suit, dropping 80 percent between December 2014 and June 2016.

In June 2015, Haley Kitagawa, Drilformance's global-operations director, sent an email to all Drilformance employees announcing changes to Drilformance's human-resources policies based on the market downturn. The email stated:

> We are in a dynamic market with the US land rig count dropping 58% from November 2014. Drilformance is in a strong financial position and has fared better than most service companies in our industry the first quarter of 2015. However, every oilfield service company will feel the effect of the downturn. There are indications we are reaching a bottom with activity beginning to improve the later part of this year. Our entire team is working hard to grow our customer base and offset the rigs lost due to reduced customer activity. There are still over 800 rigs operating in the US providing plenty of opportunity for us to make up for lost activity and continue our growth.
>
> We are a strong team and have a knack of always doing more with less when it comes to our people. The company recognizes and thanks each and every one of you for this. Our goal of keeping our strength intact, which is our people, and maintain a strong balance sheet has forced us to come up with ways of reducing cash outflows without altering the core of our organization.
>
> One of the ways of accomplishing this is through Furloughs whereby each employee takes a day off, typically a Friday, every other week. Many of our competitors and suppliers, such as Smith Bits and US Synthetic, implemented this system earlier in the year.
>
> We have also decided to take this approach for personnel to take off one day every other week beginning with the payroll period beginning June 13, 2015 until further notice. Your supervisor will discuss with you an optimal schedule to ensure we can maximize the growth of our operations to reach activity levels enabling the suspension of a reduced work schedule.
>
> Traditionally the company has enabled personnel to carry forward as mush as a years worth of unused vacation. This year no more than 3 days or 24 hours of unused vacation may be carried forward at the end of 2015. Please arrange with your supervisor to utilize your vacation balances if at all possible during this slower period. If you choose to voluntarily surrender your vacation balance, please let me know.
>
> . . . We appreciate your hard work, dedication, and understanding through this down cycle. We are all doing everything possible to increase revenue and reach profitability that enables a suspension of the reduction in work schedule.

(Docket Entries No. 32, Ex. D; No. 34, Ex. A).

This policy reduced the plaintiffs' salaries by 10 percent. Although the email stated that all employees would receive a furlough day every other week, the plaintiffs allege that they were not

able to take the furlough days, and instead continued to work their regular schedules. The plaintiffs also allege that Drilformance did not ensure that employees refrained from working on the furlough day.

The parties agree on the material facts and cross-moved for summary judgment on the effect of the salary reduction. The plaintiffs argue that the salary reduction removed them from the status of salaried professional employees, exempt from the Fair Labor Standards Act's overtime requirements. They base this on the argument that their compensation declined based on "variations in the quality or quantity of the work performed" and on "absences occasioned by the employer or by the operating requirements of the business," 29 C.F.R. § 541.602(a), making their salaries the "functional equivalent of an hourly wage." (Docket Entry No. 34). Drilformance seeks summary judgment that the plaintiffs remained exempt because the prospective salary reduction based on the economic downturn did not violate the Department of Labor's salary-basis regulation, § 541.602, and did not change the plaintiffs' exempt status. (Docket Entry No. 32).

Based on the pleadings, motions, responses, replies, the record, and the applicable law, Drilformance's motion for summary judgment, (Docket Entry No. 32), is granted, and the plaintiffs' motion for summary judgment, (Docket Entry No. 34), is denied. The reasons for these rulings are explained below.

## II. The Summary Judgment Legal Standard

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018) (citations omitted); *see also* FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" *Burrell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Brandon v. Sage Corp.*, 808 F.3d 266, 269–70 (5th Cir. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating . . . that there is an issue of material fact warranting trial.'" *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)). A fact is material if "its resolution could affect the outcome of the actions." *Aly v. City of Lake Jackson*, 605 F. App'x 260, 262 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Pioneer Exploration, LLC v. Steadfast Ins. Co.*, 767 F.3d 503 (5th Cir. 2014).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Bailey v. E. Baton Rouge Par. Prison*, 663 F. App'x 328, 331 (5th Cir. 2016) (quoting *Duffie v. United States*, 600 F.3d

4

362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Jurach v. Safety Vision, LLC*, 642 F. App'x 313, 317 (5th Cir. 2016) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 866 F.3d 698, 702 (5th Cir. 2017).

**III. Analysis**

**A. The Summary Judgment Record**

The record includes:

- an affidavit of Rusty Petree, Drilformance's corporate representative, (Docket Entry No. 32, Ex. A; Docket Entry No. 34, Ex. 4);

- deposition testimony of Brandon Sheldon, (Docket Entry No. 32, Ex. B; Docket Entry No. 34, Ex. 3);

- deposition testimony of Casey Kitagawa, (Docket Entry No. 32, Ex. C; Docket Entry No. 34, Ex. 2);

- an email, dated June 11, 2015, from Haley Kitagawa to all Drilformance employees, (Docket Entry No. 32, Ex. D; Docket Entry No. 34, Ex. 1);

- the plaintiffs' pay records, (Docket Entry No. 32, Exs. E–J); and

- Drilformance's responses to the plaintiffs' interrogatories, (Docket Entry No. 34, Ex. 5).

**B. Whether the Salary Reduction Violated the Salary-Basis Regulation**

The Fair Labor Standards Act requires employers to pay overtime to nonexempt employees who work more than 40 hours in a workweek. 29 U.S.C. § 207(a)(1). Employees who perform

5

executive, administrative, sales, or professional duties, and who are paid at least $455 per week on a salary basis, are exempt. 29 U.S.C. § 213(a)(1). The parties do not dispute that the plaintiffs performed exempt duties and were paid more than $455 per week. The disputed issue is one of law—whether, after the pay reduction, Drilformance continued to pay the plaintiffs "on a salary basis."

Department of Labor regulations define "on a salary basis" as follows:

(a) *General Rule*. An employee will be considered to be paid "on a salary basis" within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

> (1) Subject to the exceptions provided in paragraph (b), an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked. Exempt employees need not be paid for any workweek in which they perform no work
>
> (2) An employee is not paid on a salary basis if deductions from the employee's predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business. If the employee is ready, willing and able to work, deductions may not be made for time when work is not available.

29 C.F.R. § 541.602.[1]

The plaintiffs argue that exemptions to the overtime requirements must be construed narrowly against employers. The plaintiffs contend that they were not paid "on a salary basis" under § 541.602 because their salaries were "subject to reduction because of variations in the quality or

---

[1] Before 2016, the salary-basis regulation was 29 C.F.R. § 541.118. The 2016 amendment moved the regulation to § 541.602, but did not change the language relevant to the issue here. Although the cases and Department of Labor opinions refer to § 541.118, the analysis of that regulation applies equally.

quantity of the work performed" and because they were not paid their "full salary . . . without regard to the number of days or hours worked." (Docket Entry No. 34).

Drilformance responds that § 541.602 is ambiguous, pointing to Department of Labor opinions interpreting the regulation's application to salary reductions based on economic slowdowns and a Tenth Circuit case addressing the same issue. (Docket Entry No. 32). Drilformance argues that a prospective salary reduction based on declining market conditions and resulting declines in an employer's finances does not violate § 541.602.

The Department of Labor has issued three opinion letters addressing whether employers reducing salaries in response to economic slowdowns are subject to the Fair Labor Standards Act's overtime provisions. *See In re Wal–Mart Stores, Inc.*, 395 F.3d 1177, 1185 (10th Cir. 2005) (collecting authority). Department of Labor opinion letters interpreting ambiguous regulations receive *Auer* deference. That is, the Department's interpretation controls unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also In re Wal–Mart Stores, Inc.*, 395 F.3d at 1184–85 (applying *Auer* deference to the Department of Labor opinions addressing salary reductions based on economic slowdowns); *Bassiri v. Xerox Corp.*, 463 F.3d 927, 930–31 (9th Cir. 2006) (applying *Auer* deference to Department of Labor opinion letters); *Humanoids Grp. v. Rogan*, 375 F.3d 301, 306 (4th Cir. 2004) (same).

The first Department opinion letter, issued in 1970, states:

> Section 541.118 does not preclude a bona fide reduction in an employee's salary which is not designed to circumvent the salary basis requirement. A reduction in salary resulting from a temporary reduction in the normal workweek (such as you describe) is, therefore, permissible and will not defeat an otherwise valid exemption, provided that the reduction does not reduce the amount paid to the employee in any workweek to less than the minimum salary required by the regulations . . . .

U.S. Dep't of Labor, *Wage & Hour Opinion Letter dated November 13, 1970*, 1970 WL 26462.

The second letter, issued in 1997, addressed a "proposal to reduce the workweek of certain exempt employees from 40 hours to 32 hours with a commensurate reduction in pay." The letter states:

> Your client is an employer in the mental health field. Because of a reduction in spending by the state on programs administered by this employer, it must reduce operating costs. The employer has the option of either reducing the workweek for certain exempt employees or laying off employees. It proposes to reduce the workweek of the exempt employees from 40 to 32 hours with a commensurate reduction in pay. None of the employees affected will be paid less than $250 per week after the reduction.
>
> As stated in the Administrator's opinion letter of November 13, 1970 (WH-93), Section 541.118 does not preclude a bona fide reduction in an employee's salary which is not designed to circumvent the salary basis requirement. A reduction in salary resulting from a reduction in the workweek under the circumstances you describe will not defeat an otherwise valid exemption. However, if the amount of the deduction reduces the salary of an employee below the amount required by the regulations, the exemption will be lost for that employee.

U.S. Dep't of Labor, *Wage & Hour Opinion Letter dated March 4, 1997*, 1997 WL 998010.

The third letter, issued in 1998, states:

> As for Step 2 and its effect on the employees being paid a salary, 29 C.F.R. § 541.118(a) provides that employees are considered to be paid "on a salary basis" if they regularly receive each pay period a predetermined amount constituting all or a part of their compensation which is not subject to reduction because of variations in the number of hours worked or in the quantity or quality of the work performed. However, we have consistently taken the position that a bona fide reduction in an employee's salary does not preclude salary basis payment as long as the reduction is not designed to circumvent the requirement that the employees be paid their full salary in any week in which they perform work. In addition, the amount paid to the employee in any workweek must not be less than the minimum salary required by the regulations. E.g., Opinion Letter No. 1140 (WH-93) December 10, 1970. Consistent with this position, we have stated that a fixed reduction in salary effective during a period when a company operates a shortened workweek due to economic conditions would be a bona fide reduction <u>not</u> designed to circumvent the salary basis payment. Therefore, the exemption would remain in effect as long as the employee receives the minimum salary required by the regulations and meets all other requirements for the exemption.

U.S. Dep't of Labor, *Wage & Hour Opinion Letter dated February 23, 1998*, 1998 WL 852696.

These opinion letters confirm that the salary-basis regulation requiring exempt employees to receive a "predetermined amount . . . not subject to reduction because of variations in the number of hours worked or the quantity and quality of the work performed" allows employers to prospectively reduce salaries in response to business needs, such as an industry slowdown, without affecting the employees' exempt status. The 1998 letter states that "a fixed reduction in salary effective during a period when a company operates a shortened workweek due to economic conditions would be a bona fide reduction not designed to circumvent the salary basis payment." 1998 WL 852696. The Tenth Circuit, considering similar facts, applied *Auer* deference to this interpretation of the salary-basis regulation.

The plaintiffs point to § 541.602's language defining "salary" as a "predetermined amount" that is "not subject to reduction because of variations in the number of hours worked or the quantity and quality of the work performed." 29 C.F.R. § 541.602. They argue that Drilformance's salary reduction was based on reducing the number of hours worked and violates the regulation.

The plaintiffs' position is contrary to the weight of persuasive authority. In *Wal–Mart*, as here, the plaintiffs cited *Dingwall v. Friedman Fisher Assocs.*, 3 F. Supp. 2d 215 (N.D.N.Y. 1998), for the proposition that "a reduction in work time that is imposed by the employer may not be the basis for a reduction in salary." *Id.* at 215. The *Wal–Mart* court explained that *Dingwall* was an outlier and not persuasive because, "[m]ost importantly, and remarkably, the court made no reference to the applicable opinion letters." *In re Wal–Mart*, 395 F.3d at 1188. The court discussed other cases holding that the salary-basis regulation did not prohibit prospective pay reductions. *Id.* at

9

1187–88 (citing *Caperci v. Rite Aid Corp.*, 43 F. Supp. 2d 83 (D. Mass. 1999); *Ackley v. Department of Corrections*, 844 F. Supp. 680 (D. Kan. 1994)).

The *Wal–Mart* court considered the same argument the plaintiffs raise here, that an employer's "'practice' of prospectively reducing [employees'] base hours with a corresponding reduction in pay violates the salary-basis test because the 'predetermined amount' varied in accordance with the employer's business needs or the 'quantity of work performed' even when the [employee] was 'ready, willing, and able to work.'" *Id.* at 1183–84. The court rejected that argument. "We do not read the regulation so broadly. Under the text of § 541.118 and the DOL's interpretation of this regulation, an employer may prospectively reduce salary to accommodate the employer's business needs unless it is done with such frequency that the salary is the functional equivalent of an hourly wage." *Id.* at 1184.

The parties have not cited, and the court has not found, Fifth Circuit precedent addressing the issue. The court agrees with the Tenth Circuit's conclusion that an employer does not violate § 541.602 by prospectively reducing salaries to accommodate business needs or a market downturn.

The record evidence here shows that the salary reduction was prospective. The June 11, 2015 email announcing the reduction stated that it would become effective for the pay period starting June 13, 2015. (Docket Entry No. 32, Ex. D). The plaintiffs' deposition testimony and pay records show that the salary reduction was implemented only in the pay periods after the announcement. (*Id.*, Exs. B, C, I, J).

The evidence also shows that the reduction was based on the steep downturn in the oil market and drilling activity. Rusty Petree, Drilformance's corporate representative, stated that "in 2015, the oil and gas industry experienced a severe drop in active drilling rigs and overall downturn

10

in the market, which caused a correlating drop in Drilformance's gross revenue. In an effort to maintain as many jobs as possible and prevent the type of mass layoffs that had become systemic in the industry, Drilformance announced, on June 11, 2015, a prospective reduction in salaries for an indefinite period of time." (*Id*., Ex. A). Petree also stated that, as a result of the downturn, "Drilformance's drill bit revenue dropped from $1,267,449 in December 2014 to $252,599 in June 2016, an eighty percent (80%) reduction in revenue, resulting in severe losses for the company." (*Id.*). The plaintiffs do not dispute that their salary reduction was based on the downturn in the oil market.

Because the salary reduction was prospective and based on a downturn in the oil market and the company's finances, it did not violate § 541.602's salary-basis requirement.

### B. Whether the Salary Reduction was "Bona Fide"

The next issue is whether the salary reduction was "bona fide," that is, whether it was "designed to circumvent the requirement that the employees be paid their full salary in any week in which they perform work," 1998 WL 852696, or whether the salaries were reduced "with such frequency that the salary is the functional equivalent of an hourly wage." *Wal–Mart*, 395 F.3d at 1184. If salary changes "are so frequent as to make the salary the functional equivalent of an hourly wage," courts "treat the 'salary' as a sham and deny the employer the FLSA exemption for professional employees." *Id.* at 1189.

The plaintiffs argue that the salary reduction was not bona fide because Drilformance failed to ensure that the plaintiffs received a reduced workweek corresponding to the reduced salary. After the salary reduction, the plaintiffs' work schedules varied based on their workload, and they were not guaranteed additional days off. The plaintiffs argue that, by not allowing them to take a day off

11

work every other week, Drilformance "tempted its employees to accept a steep pay cut with the illusory promise of a reduced work schedule." (Docket Entry No. 34 at 12).

In support of their argument that the "furlough" day was illusory and "promised" in bad faith, the plaintiffs point to Petree's description of how the policy applied to exempt employees. "Drilformance exempt employees were neither guaranteed additional time/days off nor were required by Drilformance to take additional time/days off." (Docket Entry No. 32, Ex. A). The plaintiffs also cite Petree's deposition testimony that the employees had "a tremendous amount of autonomy of how they perform their job functions. It's their responsibility and accountability to set their hours and take care of their business." (Docket Entry No. 34, Ex. D). When asked whether anyone at Drilformance made sure that employees worked four days per week every other week, Petree stated "[a]bsolutely not." (*Id.*).

Drilformance responds that a one-time 10 percent salary reduction is not the functional equivalent of an hourly wage. Drilformance agrees that these plaintiffs did not take a furlough day off every other week. Drilformance argues that the plaintiffs had the autonomy and responsibility to set their own work schedules, based on their workloads. According to Drilformance, if these plaintiffs did not reduce their work hours, before or after the salary-reduction email, it was because they chose not to do so by virtue of the work hours they set themselves. Kitagawa testified that his work hours varied based on his workload:

> Q. Now, similar to Mr. Sheldon, was your work hours, workday, work week, dependent upon the amount of work you had?
>
> A. Yeah. I mean, it's just the way it is in the oil field, in general.
>
> Q. Sure. So the example I gave him earlier, I think, was a 7/Eleven shift worker. You weren't working shifts, correct?

> A. No.
>
> Q. Okay. If – if you completed your work on Monday, at 3:00, and had nothing else to do, you could go home. Generally?
>
> A. Yeah.
>
> Q. Okay. And the same if you didn't have work on Friday, you could go home and take a Friday off if you didn't have work?
>
> A. Pretty much. There have been times where Rusty has been more adamant about people having the face time, like you talked about earlier –
>
> Q. Uh-huh.
>
> A. – and wanting everybody there, and then there are times when he really didn't seem to care.
>
> Q. Okay.
>
> A. So, yeah, it fluctuates.
>
> Q. Okay. And then the opposite is true. If you have a bunch of work, you're going to be expected to get that done, and if that requires you to show up on a Saturday or Sunday or any other – work late nights, that's – that's understood?
>
> A. Yes.
>
> Q. Okay. And that's been the same since you started your employment, until the end, correct?
>
> A. That is correct.

(Docket Entry No. 37, Ex. C-14). Sheldon also testified that he did not have a predetermined set work-hour schedule:

> Q. Okay. Now, it's also your testimony that at least with respect to you, that this change didn't occur. You weren't able to take off one day, every other week?
>
> A. That is correct. And, again, that's because your work dictates your hours, correct?

> . . .
>
> A. Well, the work that's given to me by my supervisors.
>
> Q. Sure. The work that's given to you by your supervisors, the work that's provided to you by your company, dictates your hours?
>
> A. Yes.
>
> . . .
>
> Q. Okay. But you're still going to have the same amount of work. You may not work on Friday, but you're going to have – you're going to have to complete that work. You agree with me, right?
>
> A. Yes.
>
> Q. Okay. So having Friday off, taking a Friday off when you have amount – work that needs to be done, just means you're going to work on a weekend, right?
>
> A. Or – or the following Monday.
>
> Q. Sure. It just means more hours at some other point?
>
> A. Yes.

(Docket Entry No. 32, Ex. B-8).

Even though the plaintiffs' salaries were reduced without a corresponding reduction in their work schedule, the salary reduction was based on an economic slowdown and did not require a schedule reduction to maintain their overtime exemption. *See In re Wal–Mart*, 395 F.3d at 1184 ("Under the text of § 541.118 and the DOL's interpretation of this regulation, an employer may prospectively reduce salary to accommodate the employer's business needs unless it is done with such frequency that the salary is the functional equivalent of an hourly wage."). A 2009 Department of Labor fact sheet, posted on the Department's website, confirms this interpretation:

**7. Can an employer make prospective reduction in pay for a salaried exempt employee due to the economic downturn?**

*An employer is not prohibited from prospectively reducing the predetermined salary amount to be paid regularly to a Part 541 exempt employee during a business or economic slowdown, provided the change is bona fide and not used as a device to evade the salary basis requirements.* Such a predetermined regular salary reduction, not related to the quantity or quality of work performed, will not result in loss of the exemption, as long as the employee still receives on a salary basis at least $455 per week. On the other hand, deductions from predetermined pay occasioned by day-to-day or week-to-week determinations of the operating requirements of the business constitute impermissible deductions from the predetermined salary and would result in loss of the exemption. *The difference is that the first instance involves a prospective reduction in the predetermined pay to reflect the long term business needs, rather than a short-term, day-to-day or week-to-week deduction from the fixed salary for absences from scheduled work occasioned by the employer or its business operations.*

U.S. Dep't of Labor Wage & Hour Division, Fact Sheet # 70: Frequently Asked Questions Regarding Furloughs and Other Reductions in Pay and Hours Worked Issues (Nov. 2009) (emphasis added).

There is no record evidence showing that the salary reduction was a sham, or that reductions were so frequent that the salaries were the functional equivalent of an hourly wage or were designed to circumvent the salary-basis requirement. Even though the salary reduction did not correspond with a reduction in the plaintiffs' work schedules, it was bona fide.

## IV. Conclusion

Drilformance's motion for summary judgment, (Docket Entry No. 32), is granted. The plaintiffs' motion for summary judgment, (Docket Entry No. 34), is denied.

SIGNED on April 27, 2018, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge